This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Michael Roper, has appealed from his conviction in the Summit County Court of Common Pleas. We affirm.
 I. {¶ 2} Appellant was indicted by the Summit County Grand Jury on May 11, 2000. The indictment charged that on or about April 17, 2000, Appellant committed the crime of aggravated murder, in violation of R.C.2903.01, with two specifications, i.e. that he committed the crime while in the process of committing aggravated robbery, and that he used a firearm in committing the murder. The indictment also charged that Appellant committed the crime of aggravated robbery, in violation of R.C.2911.01(A)(1)/(A)(3), with the specification that he used a firearm in committing this crime.
 {¶ 3} Appellant entered a plea of not guilty to all charges and counsel was appointed by the trial court. Trial was had before a jury, but the jury was unable to reach a unanimous verdict. The trial judge declared a mistrial on October 20, 2000.
 {¶ 4} The parties proceeded to a second trial and on February 6, 2001, the trial court again declared a mistrial because the jury was unable to reach a unanimous agreement.
 {¶ 5} The trial court set the case for a third trial. Before the proceedings began, the parties entered into a stipulated agreement, which the trial court declared it would enforce. That agreement provided: (1) the State would not seek the death penalty, and the possible sentences that Appellant could receive would include life without parole, life with thirty years parole eligibility, or life with twenty-five years parole eligibility; (2) each party would have four peremptory challenges; (3) no mitigation hearing would be required; and (4) the trial judge would decide the sentence. The agreement was signed by Appellant, all attorneys, and the judge. Trial proceeded according to the agreement. On May 30, 2001, the court once again entered an order finding that the jury was unable to reach a verdict and the court declared a third mistrial.
 {¶ 6} On June 15, 2001, the case was transferred to a different trial judge and was set for trial. Appellant filed a motion to dismiss the indictment on July 24, 2001, asserting that retrial would violate his Fifth Amendment right to due process and fundamental fairness. The State responded to Appellant's motion to dismiss and Appellant replied. Following a hearing, the trial court denied Appellant's motion to dismiss the indictment.
 {¶ 7} The parties again agreed to the terms of the previously stipulated agreement, and the court adopted it for purposes of the fourth trial. The fourth trial began on September 17, 2001. At the outset of the proceedings, the jury was taken for a view of the crime area. Dr. Marvin Platt, the medical examiner, testified that the victim, Tom Husein, died as a result of a gunshot wound to the head, fired at short range. Crystal Cruise, girlfriend of the victim and mother of two of his children, testified that she was in the store on the day of the murder. At approximately 10:00 in the morning, she was standing with her back to the check-out area, when she heard someone say to the victim, "Tom, give me the money." Cruise turned around to see a man, whom she later identified as the Appellant, with a gun on the other side of a counter. The man shot the storeowner and ran out of the store. Robert DiDonato, who was in his van outside the store at the time, also identified Appellant as the man he saw running from the store that morning.
 {¶ 8} Appellant did not take the stand in his own defense, but instead proceeded on a theory of alibi, indicating in his notice to the court that he was with his girlfriend at the time of the offense. In addition to cross-examination of the State's witnesses, Appellant presented expert testimony regarding the memory process and factors affecting eyewitness identification.
 {¶ 9} Following deliberations, the jury found Appellant guilty of the crime of aggravated murder as well as aggravated robbery. Appellant was also found guilty of the principal offender specification to the charge of aggravated murder and both firearm specifications.
 {¶ 10} On October 9, 2001, the trial judge sentenced Appellant to a term of life imprisonment without parole on the aggravated murder charge with principal offender specification and ten years on the aggravated robbery charge, to be served concurrently. The judge also sentenced Appellant to two terms of three years each on the firearm specifications. The sentences on the firearm specifications were merged. They were to be served concurrently to each other, but consecutively to the sentence imposed on the aggravated murder charge.
 {¶ 11} Appellant now appeals from the judgment of conviction and has assigned five errors for review.
 II. Assignment of Error No. 1 {¶ 12} "THE TRIAL COURT LACKED JURISDICTION TO SENTENCE APPELLANT AFTER HIS CONVICTION FOR AGGRAVATED MURDER WITH A FELONY MURDER SPECIFICATION."
 {¶ 13} Appellant contends that the trial court erred in sentencing him without jury participation. He contends that he was entitled to be sentenced by the trial jury as well as the judge, pursuant to R.C.2929.03(C)(2)(b)(ii), because this remained a capital case, even though the State was not seeking the death penalty.
 {¶ 14} In making this argument, Appellant relies upon the recent decision of the Ohio Supreme Court in State v. Parker, 95 Ohio St.3d 524,2002-Ohio-2833. In that case, the defendant was charged with aggravated murder with a felony-murder specification. In exchange for a plea of guilty, the State agreed not to seek the death penalty. The indictment, however, was not amended. The defendant waived his right to a jury trial and his guilty plea was accepted by a single judge. The Supreme Court held that, notwithstanding the fact that the State had agreed not to pursue the death penalty, a single trial judge lacked authority to accept the defendant's guilty plea. Id. at ¶ 4.
 {¶ 15} In reaching its conclusion, the Parker court relied exclusively upon R.C. 2945.06 and Crim. R. 11(C)(3). R.C. 2945.06
requires that where the accused is charged with an offense punishable by death and he has waived a jury trial, the trial must be held to a panel of three judges. Crim. R. 11(C)(3) requires a panel of three judges to accept a plea of guilty or no contest to a charge of aggravated murder with specifications.
 {¶ 16} In Parker, the court concluded that these two provisions "clearly establish that in a capital case where a criminal defendant has waived the right to a trial by jury, a three-judge panel is required" — even where the death penalty is no longer an available sentencing option. Parker, 95 Ohio St.3d at ¶ 9. Significantly, the Parker
decision, and the cases upon which it relies, all relate to cases in which the accused has waived the right to trial by jury.
 {¶ 17} Appellant argues that the Parker case is analogous to the instant matter. We disagree. The case at bar does not involve a waiver of the right to trial by jury or acceptance of a guilty plea by a single trial judge. The Appellant in the case at bar exercised his right to a trial by jury and the matter was, in fact, fully tried to a jury.
 {¶ 18} The error assigned for review by this court involves a question of sentencing. Sentencing was not addressed by the Supreme Court in Parker. We believe sentencing is a matter of different import than waiver of the Sixth Amendment right to a jury trial. We, therefore, decline to extend the rule of Parker to the facts of the present case.
 {¶ 19} Appellant cites the "strict compliance" language inParker. Parker at ¶ 10. He suggests that this language requires that a failure to comply with any procedures attendant to charges punishable by death must receive the same treatment as the waiver of jury trial inParker. In using this "strict compliance" language, however, the Supreme Court cites to two cases that also involve a waiver of jury trial. SeeState v. Filliaggi (1999), 86 Ohio St.3d 230, 240; and State v. Pless
(1996), 74 Ohio St.3d 333, paragraph one of the syllabus. These cases do not involve the sentencing issue present in the case before this court.[1]
 {¶ 20} Furthermore, where the Supreme Court has applied the "strict compliance" language of Filiaggi to sentencing issues in a capital case, that court has determined that the doctrines of invited error, waiver, and harmless error are applicable. See State v. Campbell (2000),90 Ohio St.3d 320, 324-326.
 {¶ 21} In the case at bar, the record indicates that the parties, including Appellant, entered into the agreed stipulation first and the document was then presented to the trial court for its approval. A hearing was conducted before the court with Appellant and all counsel present. The trial judge inquired of Appellant personally and was satisfied with his understanding of the agreement and its applications. Therefore, the record supports a conclusion that Appellant invited the error because "defense counsel `induced' or `was actively responsible' for the trial court's error." Campbell, 90 Ohio St.3d at 324.
 {¶ 22} In addition, the trial judge orally reiterated that the agreement allowed for (1) four peremptory challenges rather than six and (2) that the judge would decide the sentence if the jury convicted him. In addition to signing the document, Appellant orally stated his understanding and acceptance of the agreement. Waiver is the "intentional relinquishment or abandonment of a known right." Johnson v. Zerbst
(1938), 304 U.S. 458, 464, 82 L.Ed. 1461. Therefore, the record supports a conclusion that Appellant waived the exercise of these rights and the assertion of any error in regard to them. See Campbell,90 Ohio St.3d at 325.
 {¶ 23} We also note that, the Ohio Supreme Court has indicated that a trial judge does have the "authority," in at least some circumstances, to sentence an accused in a capital murder case without jury involvement. See State v. Springer (1992), 63 Ohio St.3d 167, 170. Such reasoning certainly suggests the trial judge in the case at bar was not without such authority.
 {¶ 24} Generally, a jury — or a three-judge panel — is involved in sentencing pursuant to R.C. 2929.03(C)(2)(b) where death is a possibility. "[T]he apparent purpose of the three-judge panel requirement in capital cases is to ensure that death is not imposed upon the recommendation of a single judge." State v. Swiger (1999),125 Ohio App.3d 456, 464. However, death was not a possible sentence in the present case. Therefore, the rationale for requiring jury involvement in sentencing on this basis must fail.
 {¶ 25} Furthermore, perhaps if the sentence of life in prison without parole were sui generis to convictions for aggravated murder with specifications, there would be some logic to prohibiting a single judge from imposing this sentence. However, a judge can now sentence a person to life without the possibility of parole for other crimes as well. See, e.g., R.C. 2907.02(B) (rape of a young child, either as a repeat offense or in addition to causing serious physical harm); R.C. 2929.02 (murder with a sexual motivation specification and a sexually violent predator specification). See, also, State v. Haynes, 10th Dist. No. 01AP-430, 2002-Ohio-4389, at ¶ 37.
 {¶ 26} Appellant has provided us with no reason to extend the rule of Parker. We find no prejudicial error in allowing the parties to enter into an agreement, adopted by the trial court, which determined that Appellant would be sentenced by the trial judge alone. Accordingly, the first assignment of error is without merit.
 Assignment of Error No. 2 {¶ 27} "THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD THE APPELLANT THE STATUTORILY REQUIRED NUMBER OF PEREMPTORY CHALLENGES IN A CAPITAL CASE."
 {¶ 28} Appellant contends that the trial court erred in only allowing him four peremptory challenges at trial. He relies upon R.C.2901.02(B) and Crim.R. 24(C) in asserting that he was entitled to six such challenges, notwithstanding the fact that the State indicated it would not seek the death penalty.
 {¶ 29} R.C. 2901.02(B) explains that aggravated murder is a "capital offense" when the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in R.C.2929.04(A).[2] Crim.R. 24(C) guarantees each party in a capital case six peremptory challenges.
 {¶ 30} Appellant again relies upon the recent decision of the Ohio Supreme Court in State v. Parker (2002), 95 Ohio St.3d 524 in support of his position. Just as Parker does not address sentencing matters in capital cases, it also does not address peremptory challenges. Therefore, for the same reasons as set forth above, we find this assignment of error to be without merit.
 Assignment of Error No. 3 {¶ 31} "THE TRIAL COURT ERRED WHEN IT ALLOWED A WITNESS TO MAKE AN IN-COURT IDENTIFICATION EVEN THOUGH THE IDENTIFICATION WAS TAINTED."
 {¶ 32} Through this assignment of error, Appellant contends that the trial court erred in allowing the in-court identification of the accused by witness Robert DiDonato.
 {¶ 33} The relevant facts are as follows. On April 17, 2000, DiDonato had just completed a delivery of goods to the store owned by the victim. DiDonato got into his van, which was parked just outside the store, and was starting the engine when a man ran out of the store and past the front of the vehicle. According to DiDonato, the man looked directly up at him, with a scared look, as he ran past. Thinking this unusual, DiDonato attempted to follow the individual with his van, but soon lost sight of him.
 {¶ 34} DiDonato then heard sirens and returned to the store where he eventually spoke with police officers. He described the man to the police as a young, black male, between 19 and 25 years old, wearing dark pants and a dark jacket with white trim around the neck. The police took DiDonato to two show-ups that day to view possible suspects in the neighborhood, but DiDonato did not identify either as the man he saw running out of the store.
 {¶ 35} Three days later the Akron Beacon Journal ran a story headlined, "Witness picks out suspect's photo," accompanied by a small photograph of Appellant. At approximately 8:00 a.m. on that day, the police came to DiDonato's place of employment to present him with a six-picture photo array. They first asked if he had seen the newspaper that morning. DiDonato said he read the headline and saw the photograph about 5:00 that morning. DiDonato stated that he only "glanced" at it while making deliveries. He did not look at it more extensively, he explained, because he was working. DiDonato told the police he would not be swayed by what he had seen in the newspaper. He said he had a clear recollection of the man he saw running out of the store. DiDonato then viewed the six photos and selected the photograph of the Appellant from the array. DiDonato also identified Appellant in the courtroom during the trial, stating that he was "absolutely certain" that Appellant was the man he saw running from the store on the day of the murder.
 {¶ 36} Appellant filed two motions to suppress the identification testimony of this witness. The first was filed before the first trial and asserted a violation of due process because of an alleged poor view of the assailant and also because of the alleged taint caused by exposure to the newspaper. Following a hearing, the court denied the motion. Upon consideration of the totality of the circumstances, the trial judge found the procedures used by the police were not unnecessarily suggestive and there was no substantial likelihood of irreparable misidentification.
 {¶ 37} The second motion to suppress was filed before the third trial and was renewed at the fourth. It alleged unreliability and prejudice due to taint from the newspaper photograph. This motion was also denied, based upon the evidence presented and the prior testimony. The trial judge found that the evidence went to weight and not to admissibility.
 {¶ 38} On appeal, Appellant asserts that the trial court erred in permitting DiDonato's in-court identification. Appellant argues that the identification was tainted by the witness' observation of the newspaper headline and photograph and that the totality of the circumstances does not reveal a reliable basis for the witness' testimony.
 The Confrontation Procedure {¶ 39} In general, where a witness has been confronted by a suspect before trial, due process requires that the witness' identification of the suspect will be suppressed where 1) the confrontation procedure was unnecessarily suggestive of the suspect's guilt and 2) the identification was unreliable under the totality of the circumstances. State v. Brown (1988), 38 Ohio St.3d 305, 310, citingManson v. Brathwaite (1977), 432 U.S. 98, 53 L.Ed.2d 140; State v.Barnett (1990), 67 Ohio App.3d 760, 768. See, also, State v.McGowan-Hightower (Jan. 27, 1993), 9th Dist. No. 15723, at 6.
 {¶ 40} However, Ohio courts have held that where the allegedly suggestive circumstances did not result from state action, the evidence goes to the weight and reliability of the pre-trial identification, rather than its admissibility. Brown, 38 Ohio St.3d at 310-11. See,also, State v. Gross, 97 Ohio St.3d 121, 2002-Ohio-5524, at ¶ 22. "`The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state.'" (Emphasis added.)Id. at ¶ 19, quoting Brown, 38 Ohio St.3d at 310. See, also, Statev. Ward (Feb. 20, 2001), 10th Dist. No. 00AP-241 (upholding the admissibility of in-court identifications by witnesses exposed to media reports identifying the defendant as a suspect so long as there is no evidence suggesting that the actions of the police or the prosecution caused such exposure).
 {¶ 41} In this case, DiDonato's exposure to a media report was a chance event, not caused by the State. There is no evidence or argument to this court that the actions of the police or prosecution caused such exposure. Moreover, we note that DiDonato was thoroughly cross-examined by defense counsel. He was questioned regarding his relationship with the victim and the victim's family, the quality of his eyesight, his observations of the store and the people in it while he was there, the length of time he had to observe the man, his description of the man, discrepancies between his description and the description provided by another eyewitness, the procedures utilized by police in the two show-ups, the procedures utilized by the police for the photo array, and his attention to the newspaper article and photograph.
 {¶ 42} Consequently, the accidental exposure to the newspaper headline and picture did not require the trial court to exclude the in-court identification. See, generally, McGowan-Hightower.
 Totality of the Circumstances {¶ 43} Even assuming that the media exposure created an impermissibly suggestive confrontation, Appellant has not shown that the identification was unreliable under the totality of the circumstances.
 {¶ 44} Appellant cites State v. Jackson (1971), 26 Ohio St.2d 74, which held that an in-court identification following an improper line-up is admissible only if it is based upon independent observation of the accused and is not the result of that line-up. Id. at paragraph one of the syllabus. Appellant reasons that, even though the State was not responsible for the media exposure, such exposure still tainted the witness' identification of Appellant. The identification is, therefore, inadmissible, he claims, because it lacks an independent basis. Jackson directs that the determination of whether the in-court identification was the product of taint or independent observation requires consideration of the totality of the circumstances. Id. at paragraph two of the syllabus.
 {¶ 45} The following factors are considered in evaluating the reliability of an identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the identification. Neil v. Biggers (1972), 409 U.S. 188, 199-200,34 L.Ed.2d 401. See, also, Manson, 432 U.S. at 114. These factors are then to be weighed against any negative effects of the suggestive evidence. Id.
 {¶ 46} In the present case, DiDonato testified that on the day of the murder, he saw the face of the man running from the store from a distance of only three or four feet. It was daylight and his view was clear and unobstructed. The man looked directly at him. His face was uncovered. DiDonato was able to give a description of the assailant's clothing and it was not inconsistent with the description given by the other eyewitness to the crime. There was possible disagreement only over whether the assailant wore a dark stocking cap. Since a cap is easily removable and since the two witnesses saw the assailant at different places and at sequential times, this factor is not conclusive. Nor do we find it to be a major point in the overall identification process.
 {¶ 47} Immediately after the crime, DiDonato affirmed that neither of the two individuals presented to him in show-ups was the suspected assailant. It was only three days later when DiDonato selected Appellant's picture from a photo array of six black males. There is no evidence that the photo array itself was constructed or presented in a suggestive manner. DiDonato never identified another person as the assailant.
 {¶ 48} Some debate took place during the trial as to whether the assailant had any facial hair. Arrest photos of the Appellant reveal very slight facial hair, so slight that failure to include mention of it in a description cannot be considered a determinative factor.
 {¶ 49} Under the totality of the circumstances of this case, we cannot say that there is a very substantial likelihood of misidentification. Short of such a finding, "such evidence is for the jury to weigh." Manson, 432 U.S. at 116. As the United States Supreme Court said in Manson, "We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Id.
 Lack of Objection {¶ 50} Finally, to the extent that Appellant's argument is based on the admissibility of evidence, per se, we note that there was no objection during the trial to preserve any error in regard to identification testimony. Nor does Appellant cite to the existence of any such objection in his brief. See App.R. 12(A)(2) and App.R. 16(A)(7). Failure to lodge a timely objection to the admission of testimony results in a forfeiture of any claimed error. State v. Allen (1995),73 Ohio St.3d 626, 633. "[A]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."State v. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus, vacated on other grounds (1978), 438 U.S. 911,57 L.Ed.2d 1156. See State v. Crosby (Mar. 21, 1991), 8th Dist. No. 58168. Evid.R. 103(A)(1).
 {¶ 51} Accordingly, we find that the trial court did not err in allowing the in-court identification. Appellant's third assignment of error is without merit.
 Assignment of Error No. 4 {¶ 52} "THE JUDGMENT OF CONVICTIONS FOR AGGRAVATED MURDER AND ROBBERY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW."
 {¶ 53} Appellant contends that the weight of the evidence presented at his trial fails to support the judgments of conviction for the crimes of aggravated murder and robbery. Specifically, Appellant assails the reliability of the eyewitness identifications by Crystal Cruise and Robert DiDonato, and claims, in cursory fashion, an absence of any additional "credible" evidence. Appellant's argument is not well taken.
 {¶ 54} In determining whether a conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 55} We recognize the general rule that the consideration of credibility and the weighing of evidence are primarily within the province of the finder of fact. Furthermore, a jury's verdict should be the object of judicial deference if it is supported by evidence from which a reasonable inference of guilt could be made. "The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." Fosterv. California (1969), 394 U.S. 440, 443, 22 L.Ed.2d 402, fn. 2. The Ohio Supreme Court has written similarly: "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 56} Appellant's argument appears to be that the two eyewitnesses were unable to provide accurate descriptions of the assailant. First, as to witness Cruise, Appellant relies upon expert testimony to suggest that her ability to give an accurate description was diminished by the presence of a weapon and the fear of personal harm. However, Cruise also testified that she immediately recognized the assailant as a previous customer in the store. She reported this fact in her 911-call for emergency help and also to the police officers when they arrived on the scene. Such a factor has been considered in case law to make identification testimony more reliable. See, e.g., State v. Huff
(2001), 145 Ohio App.3d 555, 564 ("A strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed."); Barnett (1990), 67 Ohio App.3d at 768 ("One of the strongest of these external factors which may be used to prove the accuracy of the identification is the situation where the witness already knew the perpetrator before the crime was committed."). The defense's own expert even stated that, in general, the more contact a person has with someone, the more likely they are going to be accurate.
 {¶ 57} In Cruise's 911-call, which was taped and played for the jury, Cruise described the assailant as a black male, wearing a black hat, black coat, 23-24 years of age, wearing no glasses, and as someone she had seen in the store "plenty of times."[3] Cruise described the assailant to the first police officer on the scene as a black male, 5'6" to 5'7", 140 to 150 pounds, dark complexion, and 23 to 24 years of age. She also stated that the assailant held the gun in his left hand. Another officer filed an incident report and included Cruise's description of the assailant to him as follows: a black male, 22 to 23 years of age, 5'8" to 6', 140 pounds, dark complexion, blue knit hat, black waist-length coat, and unknown pants. Cruise told him she had seen the assailant in the store before. Cruise also described the assailant to the detective at the Identification Bureau as a black male, medium to dark complexion, about 5'6", and 140 to 150 pounds. She was not certain about facial hair.
 {¶ 58} Cruise was taken to two in-person show-ups in the neighborhood immediately after the shooting and made three trips to the police station where she viewed several hundred photographs on a computer. She did not identify any of those individuals as the assailant. Following receipt of additional information, the police took a photo array of six pictures to Cruise on Tuesday evening. At that time she selected Appellant's picture from the array.
 {¶ 59} As to DiDonato, Appellant claims that his testimony lacks credibility because the witness' opportunity to view the assailant was brief. We have considered the admissibility of DiDonato's identification testimony above and concluded that the evidence was properly before the jury.
 {¶ 60} DiDonato described the man as a young black male, between 19 and 25, wearing dark pants and a dark jacket with white trim around the neck. According to DiDonato, the individual was not wearing a hat and did not have facial hair, meaning a beard. When DiDonato identified Appellant in the courtroom, the witness stated that he was "absolutely certain" that Appellant was the man who ran out of the store on the day of the murder.
 {¶ 61} At the time of his arrest, Appellant was 5'9" and weighed 194 pounds. His booking photo reveals that he had sparse facial hair, including a narrow mustache.
 {¶ 62} Appellant also claims that the State presented no other credible evidence proving him to be the person who shot and killed Tom Husein. While it may be that no one piece of evidence irrefutably ties Appellant to this murder, there are several pieces to the puzzle that the jury, as the trier of fact, was entitled to consider in evaluating the evidence.
 {¶ 63} First, Cruise described the assailant as holding and shooting the gun with his left-hand. Appellant is left-handed.
 {¶ 64} Second, Karen Abdullah, the victim's daughter, testified that on the day prior to the shooting, she observed the Appellant in the store with a black-handled gun. Detective Bertina King testified that Appellant reported that he was in the store on the day prior to the shooting and that Abdullah waited on him.
 {¶ 65} Third, Thomas Witcher, an inmate at the Summit County Jail, testified that Appellant admitted to him that he shot Tom Husein and then threw the gun in Summit Lake near some houses and a school.
 {¶ 66} Fourth, Michael Vegh, a member of the rescue recovery dive team of the Akron Fire Department, testified that the team spent three days searching the portion of the lake described by Witcher and discovered a single black revolver.
 {¶ 67} Fifth, an autopsy of the victim revealed that the bullet that caused Husein's death was not found in the body. A subsequent search of the store revealed a single projectile, a fired full metal-jacket bullet.
 {¶ 68} Fifth, Richard Turbok, a firearms examiner with the Ohio Bureau of Criminal Identification and Investigation, conducted tests on the projectile found in the store and on the weapon removed from Summit Lake. He testified that the bullet was a .38 caliber projectile, which could have been fired from a .38 Special, a .357, or a 9-millimeter weapon. The witness believed that the bullet was most consistent with being fired from a .38 Special. The weapon recovered from Summit Lake was a .38 Special Smith Wesson. The witness also compared the bullet recovered from the store with one that was test-fired from the recovered revolver. He testified that both projectiles had five lands and grooves, with similar measurements, as well as the same right-hand twist, making the revolver recovered from Summit Lake consistent with the bullet found in the store. The corrosion of the recovered weapon made a more precise match impossible to confirm.[4]
 {¶ 69} Both eyewitnesses identified the Appellant — and no one else — as the assailant. The witnesses' descriptions of the assailant were the subject of thorough cross-examination by defense counsel and, in addition, a defense expert exhaustively explored the process and perils of eyewitness identification. The jury was free to believe all, part, or none of the testimony offered by either of the eyewitnesses regarding the assailant's height, weight, and clothing. Moreover, each of the additional pieces of evidence served to corroborate and support the identification testimony of the two eyewitnesses.
 {¶ 70} Upon review of the entire record, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accordingly, the fourth assignment of error is without merit.
 Assignment of Error No. 5 {¶ 71} "THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO DISMISS BASED ON DOUBLE JEOPARDY."
 {¶ 72} Although Appellant has nominally brought this assignment of error in terms of double jeopardy, we construe his argument to be a claimed violation of due process and fundamental fairness instead. We do so because Appellant's argument in support of the assigned error is based upon due process and because that issue was preserved below.
 {¶ 73} At the same time, Appellant has failed to preserve a double jeopardy claim. In fact, Appellant conceded, both at trial and on appeal, that he had not been placed in jeopardy by three hung jury mistrials. The Double Jeopardy Clause has been held not to bar a retrial where there is a "manifest necessity" for declaring a mistrial. UnitedStates v. Perez (1824), 22 U.S. 579, 580, 6 L.Ed. 165. A "hung jury remains the prototypical example" of manifest necessity. Oregon v.Kennedy (1982), 456 U.S. 667, 672, 72 L.Ed. 416. See, also, Downum v.United States (1963), 372 U.S. 734, 736, 10 L.Ed.2d 100. No contention is made that the trial judge declared a mistrial prematurely or improperly on any of the three occasions. Thus, there is no double jeopardy issue before this court.
 {¶ 74} Instead, Appellant argues that there is a point at which repeated mistrials will violate an accused's right to due process, and he contends that the point was reached in the present case after the third mistrial. Appellant maintains that the trial testimony became "increasingly slanted towards the prosecution." Appellant does not claim that any individual witness changed his or her testimony over the course of these proceedings, however. Cf. Carsey v. United States (C.A.D.C. 1967), 392 F.2d 810, 813-14 (Levanthal, J., concurring). Rather, Appellant's claim is based on the fact that the prosecution added one new witness in the third trial and anticipated calling another new witness in the fourth trial. Appellant admits that otherwise each of the four trials was "virtually identical." Therefore, we will address the argument raised by Appellant, regarding the two additional witnesses, as an argument challenging due process and fair trial.
 {¶ 75} In support of his claim, Appellant asserts that trial courts have the inherent authority to terminate a prosecution following hung jury dismissals. Ohio has recognized the authority of a trial judge to dismiss a case in the interest of justice. State v. Busch (1996),76 Ohio St.3d 613, 615. A trial court has been said to have the inherent authority to regulate the practice before it and protect the integrity of its proceedings. Id. at 615-616. See, also, United States v. Ingram
(D.D.C. 1976), 412 F. Supp. 384, 385 (Dismissal of prosecution by trial court is a matter of "fair play."); State v. Abbati (1985), 99 N.J. 418,432, 493 A.2d 513 ("[J]udicial responsibility for the proper administration of criminal justice also gives rise to the inherent power to dismiss an indictment in appropriate circumstances."); State v.Moriwake (1982), 65 Haw. 47, 55, 647 P.2d 705 (trial court has "implicit powers" to terminate a prosecution).
 {¶ 76} The question of whether due process has been breached by any number of retrials does not rest solely on a mechanical application involving the number of mistrials that have occurred. For example, in Ingram, two hung juries were enough to convince the court to dismiss the indictment, where the votes leaned strongly towards acquittal and there was no prospect of new proof at a third trial. Ingram,412 F. Supp. at 385. In other cases, four trials were not considered to be too many. See, e.g., Ex Parte: Anderson (Ala. 1984), 457 So.2d 446; Arnold v.State (Tenn.Crim.App. 1977), 563 S.W.2d 792, 794-795. See, also, Statev. McCalister (Jan. 10, 1996), 9th Dist. No. 17088 (upheld a conviction for murder following three mistrials, including two hung juries). See, generally, Annotation, Propriety of courts dismissing indictment or prosecution because of failure of jury to agree after successive trials (1981), 4 A.L.R.4th 1274.
 {¶ 77} Instead, the trial judge must consider the interest of the public in the proper administration of justice as well as the fundamental fairness owed to a defendant. See, generally, Moriwake, 65 Hawaii at 56; Abbati (1985), 99 N.J. at 429; Arnold, 563 S.W.2d at 795. Such a decision properly rests within the sound discretion of the trial judge and must be guided by the circumstances of each case. Busch,76 Ohio St.3d at 615-616. See, also, Ingram 412 F. Supp. at 385; Abbati, 99 N.J. at 429;Moriwaki, 65 Hawaii at 55; State v. Witt (Tenn. 1978), 572 S.W.2d 913,917.
 {¶ 78} Appellant's motion to dismiss was presented below prior to the fourth trial. It is appropriate to consider the arguments raised in the court below and the state of the record at that point. The trial judge conducted an oral hearing on Appellant's motion. As part of its argument, the State pointed to the fact that the three previous trials produced jury votes of eleven-to-one, eight-to-four, and ten-to-two, respectively, in favor of conviction. In response, the defense contended that the votes were virtually unanimous along racial lines, with African-Americans voting to acquit and Caucasians voting to convict. The trial court addressed the issue by ordering an individual voir dire of the jury venire. Both parties were permitted to engage in careful and extensive questioning of the potential jurors. The resulting panel did, in fact, include several African-Americans and Appellant has abandoned the argument on appeal.
 {¶ 79} The trial judge expressed concern regarding the repeated mistrials in this case and, ultimately, determined that some issues — such as potential racial bias — could be resolved through the voir dire process and others through cross-examination. He stated that he would not tolerate surprise witnesses and set a date certain for the completion of discovery. The motion to dismiss was denied.
 {¶ 80} We now turn to the main question raised on appeal: whether Appellant's right to due process and fair trial were violated by the calling of new witnesses at the third and fourth retrials. We first consider the testimony of the victim's daughter, Karen Abdullah, who testified for the first time at the third trial. Abdullah testified that she was working in the store the day before the murder and that Appellant came in twice that day. She recognized him as a fairly regular customer. On the second visit to the store, she noticed the black handle of a gun in the waistband of Appellant's pants. She thought little of it because that was not an uncommon experience at the store.
 {¶ 81} The defense objected to the testimony at the time it was presented because they had not been advised of the entire substance of the witness' testimony, specifically, the presence of the gun. A hearing was conducted at which it was determined that no witness statement had ever been reduced to writing, that any failure to disclose was not intentional, and that Abdullah's testimony was not exculpatory. Apparently, Abdullah spoke to a prosecutor shortly after the murder and the prosecutor was to give Abdullah's telephone number to a police detective. However, no police officer ever called her. A later conversation with Detective King took place while the detective was driving Abdullah to a meeting with prosecutors. That conversation was never reduced to writing because the detective did not know Abdullah had not previously made a statement.
 {¶ 82} The court denied a defense motion to declare a mistrial, but recessed the proceedings for one and one-half days to give defense counsel time to address the information. Opportunity was permitted to fully cross-examine the witness. That trial ended with a hung jury. Abdullah testified similarly in the fourth trial.
 {¶ 83} Jail inmate, Thomas Wichter, testified for the first time in the fourth trial regarding a purported confession he received from the Appellant. The delay in calling him as a witness is explained by the fact that a revolver was retrieved from Summit Lake only prior to the fourth trial and this concrete evidence corroborated the otherwise questionable testimony of a jail inmate. It is understandable that the State might choose not to present Wichter as a witness without supporting evidence. However, when corroborating evidence was obtained, the State is not obligated by any principle of which we are aware to ignore it.
 {¶ 84} Both parties have suggested that we consider factors developed by courts in other jurisdictions in undertaking the balance between the interest of the public and the fundamental fairness owed to a defendant.
 {¶ 85} The Hawaii Supreme Court listed the following factors to be considered in reaching such a decision: "1) the severity of the offense charged; 2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; 3) the character of prior trials in terms of length, complexity and similarity of evidence presented; 4) the likelihood of any substantial difference in a subsequent trial, if allowed; 5) the trial court's own evaluation of the relative case strength; and 6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney." Moriwake, 65 Hawaii at 56.
 {¶ 86} Similar factors were suggested by the Iowa Court of Appeals as follows: "(1) weight of the evidence of guilt or innocence; (2) nature of the crime involved; (3) whether defendant is or has been incarcerated awaiting trial; (4) whether defendant has been sentenced in a related or similar case; (5) length of such incarceration; (6) possibility of harassment; (7) likelihood of new or additional evidence at trial; (8) effect on the protection to society in case the defendant should actually be guilty; (9) probability of greater incarceration upon conviction of another offense; (10) defendant's prior record; (11) the purpose and effect of further punishment; and (12) any prejudice resulting to defendant by the passage of time." State v. Lundeen (Iowa App. 1980),297 N.W.2d 232, 236. See, also, Abbati, 99 N.J. at 435.
 {¶ 87} Both sets of factors include a consideration of the likelihood of new or additional evidence at another trial. Indeed, several courts have dismissed proceedings following hung jury mistrials where it appeared that the same evidence would be presented and another hung jury was likely. In State v. Witt (Tenn. 1978), 572 S.W.2d 913,917, the court found the case was properly dismissed following three mistrials for deadlocked juries where "it [appeared] that at future trials substantially the same evidence will be presented and that the probability of hung juries is great." The Moriwake court similarly found that the case was properly dismissed by the trial judge after two mistrials due to hung juries where the same evidence was expected in any future trial. Moriwake, 65 Hawaii at 49-50. The Ingram court also approved dismissal of an indictment following two hung jury mistrials where no new evidence was anticipated. Ingram, 412 F. Supp. at 385. Significantly, the case at bar presents a situation where new evidence was anticipated, and was, in fact, presented in the proceeding following the motion to dismiss.
 {¶ 88} In regard to the factors which are relevant to the case at bar, the record reveals that the crimes charged, aggravated murder and aggravated robbery, are very serious, the victim is dead, the accused has a substantial criminal record, and there is no evidence that the prosecution was motivated by bad faith or that the conduct of the trial has been unfair to the accused. While Appellant was incarcerated during the first two trials, he was apparently placed on house arrest following the adoption of the agreed stipulation. There was no evidence or reason to believe that a future jury could not reach a unanimous verdict in this case. The three prior juries had apparently voted eleven-to-one, eight-to-four, and ten-to-two, respectively, in favor of conviction. The fourth trial was anticipated to have additional evidence that could point to Appellant's guilt. The victim's family wishes the State to prosecute.
 {¶ 89} Upon review of the entire record in this case, we find the discretion exercised by the trial court to have been thoughtful and sound. During the third trial, the trial court explored the circumstances of the unexpected testimony of one new witness and granted a recess to the defense in order to address it. Appropriate notice of the State's new witness for the fourth trial was given. The trial court used care in conducting an individual voir dire of each member of the venire regarding any potential racial bias. As the Ohio Supreme Court declared in a similar situation, we see no justice in denying the prosecution an opportunity to present its case. State v. Widner (1981),68 Ohio St.2d 188, 192. "Our society still retains a genuine interest in making certain that the guilty are punished." Id.
 {¶ 90} We find that the denial of the motion to dismiss did not constitute a violation of due process or fundamental fairness to the Appellant. The fifth assignment of error is overruled.
 III. {¶ 91} Appellant's five assignments of error are overruled and the judgment of the court of common pleas is affirmed.
 {¶ 92} The Court finds that there were reasonable grounds for this appeal. We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27. Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
SLABY, P.J. and BAIRD, J., concur
[1] Nor do they involve the peremptory challenge issue discussed, infra.
[2] In the present case, Appellant's indictment alleged a violation of R.C. 2929.04(A)(7), i.e. that aggravated murder was committed while the offender was committing or attempting to commit aggravated robbery.
[3] {¶ a} Appellant has indicated in his brief to this court that Cruise initially described the assailant as a "n-----" in her 911-telephone call for emergency help. The racial slur is contained in the record, but Appellant fails to explain the relevance of the remark to his argument.
{¶ b} Any usage of this word would normally be a matter of concern, but a review of the record also reveals the following. The jury that ultimately convicted Appellant included at least three African-Americans. Further, a defense expert testified, on cross-examination, that the potential unreliability of cross-racial identifications is diminished when the witness has been immersed in the other culture. In this case, the witnesses worked in a neighborhood which was largely African-American, the store served mostly African-American customers, the victim's brother (the uncle of Cruise's children) was part African-American, and there was no suggestion or evidence that race played any intentional role in the eyewitnesses' identifications of Appellant. Accordingly, this fact, standing alone, does not support any argument Appellant has advanced.
[4] We also note that the trial court allowed the defense to have its own ballistics expert to examine the weapon found in Summit Lake as well as the bullet found in the store.