STATE OF HAWAII, Plaintiff-Appellant, *v.* GILBERT MASARU MORIWAKE, Defendant-Appellee

NO. 7958

(CRIMINAL NO. 53140)

JUNE 30, 1982

RICHARDSON, C.J., LUM AND NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR,
ASSIGNED TEMPORARILY

OPINION OF THE COURT BY RICHARDSON, C.J.

The question on appeal is whether an indictment for manslaughter was properly dismissed with prejudice following two hung jury mistrials on the charge. Appellant State of Hawaii ("State") argues that constitutional principles of double jeopardy posed no bar to further prosecution, and that the trial court abused what the State agrees was the court's inherent power to preclude further prosecution in such circumstances. While the double jeopardy proscriptions of our federal and state constitutions did not themselves bar continued prosecution, we affirm because we do not view the trial court's action to have been an unjustified exercise of implicit powers.

I.

On July 31, 1979, Gilbert Masaru Moriwake was indicted for manslaughter. The indictment charged that "[o]n or about the 12th

day of May, 1979, in the City & County of Honolulu, State of Hawaii, . . . [Moriwake] did recklessly cause the death of Ruby Scanlan by beating her [with his hands and feet], thereby [violating HRS § 707-702(1)(a) (1976)[1]] . . . ."

A three-day jury trial was had in February 1980. Moriwake apparently did not deny the homicide, but instead defended against the manslaughter charge on the ground that his state of mind with regard to Scanlan's death did not constitute recklessness due to extreme intoxication at the time.

Following approximately ten hours of deliberation on the charge, the jury informed the judge that it could not reach a verdict. The judge, after questioning the jury regarding whether and how the deadlock might be broken, concluded that the jury was at an impasse and declared a mistrial *sua sponte.*

Three months later, Moriwake was again brought to trial for manslaughter. Although before a different judge and jury, the three day jury trial was essentially the same as the first trial with regard to the evidence presented, the witnesses testifying and the legal theories argued.

Four communications from the jury to the judge during the jury's subsequent deliberation on the charge reflected its inability to reach a verdict. After rereading instructions, providing the jury with copies of certain instructions and questioning the jury, the judge concluded that the jury was at a impasse and declared a mistrial *sua sponte.*

Soon thereafter, Moriwake moved that his indictment for manslaughter be dismissed. In an order filed July 22, 1980, the trial court granted Moriwake's motion.[2] The order does not set forth the bases for the trial court's decision, but the transcript of the hearing on Moriwake's motion includes the following statement by the judge:

There have been two trials in this case entailing essentially the

---

[1] That subsection provides in relevant part that "[a] person commits the offense of manslaughter if . . . [h]e recklessly causes the death of another person . . . ." Subsection (3) provides that manslaughter is a class B felony. HRS § 706-660 (1976) specifies that the maximum penalty for conviction of such a felony is ten years' imprisonment.

[2] The order was phrased as one granting a motion to dismiss prosecution. We here describe the order as one dismissing the indictment with prejudice to connote that Moriwake could not thereafter be reindicted for manslaughter.

same evidence. And if there were a third trial, virtually the same evidence would very likely be presented. Both of these previous instances, there were hung juries. And the court feels that under the circumstances of this case, a third trial would pose an undue emotional, personal and financial hardship on the defendant.

Of course, if this were a situation entailing, say, murder for hire or a criminal situation, then it would be an element against dismissal. But, as the trial has indicated, [3] this entailed certain, shall we say, mitigating circumstances that were not indicative of criminal propensity as in the case, say, of murder or a criminal situation.

The State subsequently brought this appeal from the dismissal of the indictment.[4]

## II.

We view this case as involving the following two issues:

(1) Was further prosecution of Moriwake barred by constitutional proscriptions of double jeopardy?

(2) Did the trial court possess discretion to dismiss the indictment, and, if so, was such discretion properly exercised?

## III.

### A.

Turning first to the double jeopardy issue, we begin with our federal constitution's ban against the subjection of any person "for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V. This injunction has been made applicable to the states. *Benton v. Maryland,* 395 U.S. 784, 793-96 (1969).

The principle embodied in the clause has a "primary purpose . . . akin to that served by the doctrines of *res judicata* and collateral estoppel — to preserve the finality of judgments." *Crist v. Bretz,* 437 U.S. 28, 33 (1978). But equally if not more important, it stands for

---

[3] The judge who heard the motion was the same judge who presided over the second trial.

[4] Such an appeal is permitted the State under HRS § 641-13 (1976).

the following proposition:

> [T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187-88 (1957). *Accord: United States v. Jorn,* 400 U.S. 470, 479 (1971) (plurality opinion); and *Arizona v. Washington,* 434 U.S. 497, 503-04 (1978).

The prohibition against double jeopardy is not implicated until jeopardy has "attached." *Serfass v. United States,* 420 U.S. 377, 388 (1975). To prevent the consequences to a defendant of endless prosecution as well as to give effect to a defendant's "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689 (1949), such attachment need not await actual conviction or acquittal. More specifically, in a jury trial jeopardy attaches once the jury is empaneled and sworn, *Downum v. United States,* 372 U.S. 734 (1963), and this rule has specifically been made applicable to the states. *Crist v. Bretz, supra,* 437 U.S. at 37-38.

However, even if jeopardy may generally attach prior to judgment, reprosecution is not *per se* precluded if a trial is aborted. This was the holding in the seminal case of *United States v. Perez,* 22 U.S. 579 (1824), in which the Court stated the rule that principles of double jeopardy pose no bar to reprosecution after discharge of a jury if there was a "manifest necessity for . . . [such discharge], or the ends of public justice would otherwise be defeated." *Id.*[5]

The rule has remained applicable because of a continuing recognition that "a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury . . . would be too high a price to pay for the added assurance of personal security and free-

---

[5] The specific language of the opinion is as follows:

We are of opinion, that the facts constitute no legal bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defence. We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be

dom from government harassment which such a mechanical rule would provide." *United States v. Jorn, supra,* 400 U.S. at 480. Stated differently:

> Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial be concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.

*Arizona v. Washington, supra,* 434 U.S. at 505. *Accord: Wade v. Hunter, supra* (defendant's right to complete trial with chosen jury "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.").

Which of the "variety of circumstances" resulting in mistrial declarations rise to the level of "manifest necessity" so as to allow reprosecution has been the subject of much discussion. *See generally* Schulhofer, *Jeopardy and Mistrials,* 125 U. Pa. L. Rev. 449 (1977). But what is generally not in dispute is that a mistrial ordered *sua sponte* because of a true inability of the jury to agree upon a verdict represents the "classic example" of manifest necessity. *Gori v. United States,* 367 U.S. 364, 370-71 (1961) (Douglas, J., dissenting); *Downum v. United States, supra,* 372 U.S. at 735-36. And in reviewing hung jury mistrial declarations in the double jeopardy context, appellate courts are counselled as follows:

> [I]n this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is

---

sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office.

unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. . . . The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court. *Arizona v. Washington, supra,* 434 U.S. at 509-10.[6]

We applied the federal scheme in *State v. Pulawa,* 58 Haw 377, 569 P.2d 900 (1977), *State v. Mayo,* 62 Haw. 108, 612 P.2d 107 (1980),[7] and *State v. Martin,* 62 Haw. 364, 616 P.2d 193 (1980).[8] [9] In

---

[6] This is not to say that the trial court should not exercise every means at its disposal to obtain from the jury a verdict which does represent the latter's "considered judgment." Some such means are suggested in the following comment:

Good trial practice requires a judge to determine whether future deliberations will be futile by questioning the jurors and by considering the nature and complexity of the case, the length of the trial, and the time spent in deliberations. A judge may summon the jury to inquire into the status of its deliberations or may follow instead the more cautious procedure of waiting until the jury takes the initiative. The judge may question the foreperson or may poll the other jurors as well. A jury's firm statement of deadlock may be accepted by the judge or further deliberations may instead be required, with or without additional instructions relating to elements in the case, the burden of proof, or the nature of the unanimity requirement.

Schulhofer, *Jeopardy & Mistrials, supra,* 125 U. Pa. L. Rev. at 487.

[7] *But see* Mayo v. State, 528 F. Supp. 833 (D. Hawaii 1981) (following conviction for rape after this court allowed retrial over defendant's double jeopardy claims in State v. Mayo, *supra,* defendant obtained federal district court issuance of writ of habeas corpus on ground no manifest necessity existed for initial mistrial).

[8] *See also* King v. Davis, 4 Haw. 213 (1879).

[9] In addition, this scheme is reflected in our criminal statutes. HRS § 701-110 (1976), which follows section 1.09 of the Model Penal Code (Tent. Draft No. 5, 1956), provides in relevant part as follows:

When a prosecution is for an offense under the same statutory provision and is based on the same facts as a former prosecution, it is barred by the former prosecution under any of the following circumstances:

. . . .

(4) The former prosecution was improperly terminated . . . . Termination under any of the following circumstances is not improper:

. . . .

(b) The trial court finds the termination is necessary because:

. . . .

(iv) The jury is unable to agree on a verdict . . . .

again doing so here,[10] we think it clear from the record that the reasons for which mistrials were declared in both prosecutions constituted "classic examples" of "manifest necessity": a true inability on the part of the jury to reach a verdict after diligent effort by the trial court to encourage a "considered judgment." Accordingly, our federal constitution's double jeopardy proscription, as heretofore interpreted by the United States Supreme Court, did not mandate dismissal of Moriwake's indictment.

We also think this conclusion to be consistent with the double jeopardy bar set forth in our own constitution.[11] We are fully cognizant that greater protection may be afforded criminal defendants under our state proscription than the minimum safeguards we must implement under the federal bar. *See generally: State v. Huelsman*, 60 Haw. 71, 88, 588 P.2d 394, 405 (1978) (state constitution guarantees against deprivation of liberty without due process not necessarily limited to those provided under analogous provisions of federal constitution); *Huihui v. Shimada*, 64 Haw. 527, 531, 644 P.2d 968, 971 (1982). However, we do not view this as an appropriate case in which to address the question.[12]

---

[10] We do so despite the fact that the record contains little or no indication that the trial court's ruling addressed double jeopardy concerns. *See* State v. Martin, *supra,* 62 Haw. at 373, 616 P.2d at 199 (because protection against double jeopardy is constitutionally guaranteed, appellate court will consider double jeopardy issues first raised on appeal). But see *infra,* n.16.

[11] "[N]or shall any person be subject for the same offense to be twice put in jeopardy . . . ." Haw. Const. art, I, § 10.

[12] We have noted the possibility of interpreting our state constitution to afford greater protection than the federal constitution because we do not see in the federal scheme thus far developed any ultimate limit on the number of retrials which may be had under certain circumstances. We recognize that "[t]he argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country", Arizona v. Washington, *supra,* 434 U.S. at 509. But we cannot believe that an infinite number of retrials, whatever the reasons, are consistent with double jeopardy principles. We agree that "[t]here indeed may be a breaking point . . . ." United States v. Gunter, 546 F.2d 861, 866 (10th Cir. 1976). Perhaps a future case more appropriate to such consideration than is this one will present the proper occasion for addressing whether and under what circumstances the prohibition against double jeopardy in our state constitution mandates such a "breaking point."

## B.

We next consider whether our trial courts have the power to dismiss *sua sponte* an indictment with prejudice and over the objection of the prosecuting attorney. Within the bounds of duly exercised discretion, we think that they do.

Our constitution vests the "judicial power of the State" in the courts. Haw. Const. art. VI, § 1. Nowhere in that document is the exact nature of the "judicial power" defined, and we agree that the "essentially inherent or implied powers of the court are by their nature impracticable if not impossible of all-inclusive enumeration." *People v. Sidener,* 25 Cal. Rptr. 697, 705, 375 P.2d 641, 649 (Cal. 1962) (Schauer, J., dissenting), *overruled in People v. Tenorio,* 89 Cal. Rptr. 249, 250, 473 P.2d 993, 994 (Cal. 1970). But speaking generally, the "inherent power of the court is the power to protect itself; the power to administer justice whether any previous form of remedy has been granted or not; the power to promulgate rules for its practice; and the power to provide process where none exists." *In re Bruen,* 172 P.1152, 1153 (Wash. 1918).[13]

That aspect of the judicial power which seeks to "administer justice" is properly invoked when a trial court *sua sponte* dismisses an indictment with prejudice following the declaration of one or more mistrials because of genuinely deadlocked juries, even though the defendant's constitutional rights are not yet implicated.[14] In so stat-

---

[13] In HRS § 603-21.9 (1976), our legislature has undertaken the enumeration of the inherent powers conferred on our circuit courts by the constitution. The section contains the following broad description of the courts' residual powers: "The several circuit courts shall have power: . . . (6) To . . . do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them."

[14] This was also the tack taken by the Supreme Court of Tennessee in considering whether a trial judge properly dismissed murder indictments following three hung jury mistrials:

We do not think that the relief applicable here can be accurately labelled double jeopardy, cruel and unusual punishment or due process. However, we think that trial judges have the inherent authority to terminate a prosecution in the exercise of a sound judicial discretion, where, as here, repeated trials, free of prejudicial error, have resulted in genuinely deadlocked juries, and when it appears that at

ing, we are cognizant of the deference to be accorded the prosecuting attorney with regard to criminal proceedings, but such deference is not without bounds. As stated elsewhere:

> Society has a strong interest in punishing criminal conduct. But society also has an interest in protecting the integrity of the judicial process and in ensuring fairness to defendants in judicial proceedings. Where those fundamental interests are threatened, the "discretion" of the prosecutor must be subject to the power and responsibility of the court.

*State v. Braunsdorf*, 297 N.W.2d 808, 817 (Wis. 1980) (Day, J., dissenting).

In considering whether such power and responsibility were properly exercised, we in turn will accord deference to the conclusion of the trial court for much the same reason that we will seldom question the propriety of a hung jury mistrial declaration. *See Arizona v. Washington, supra,* 434 U.S. at 509-10. But we think that the magnitude of the respective interests of society and of criminal defendants which are implicated in this area of the law requires that we more fully delineate the parameters within which this discretion is properly exercised.

Simply put, "[i]t is a matter of balancing the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system." *State v. Braunsdorf, supra,* 297 N.W.2d at 817. The factors which the trial court should consider in undertaking this balance include the following: (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney. *Cf. State v. Lundeen,* 297

---

future trials substantially the same evidence will be presented and that the probability of continued hung juries is great.

State v. Witt, 572 S.W.2d 913, 917 (Tenn. 1978). *Accord:* United States v. Ingram, 412 F. Supp. 384, 385-86 (D.D.C. 1976).

N.W.2d 232, 236 (Iowa App. 1980) (list of twelve "relevant considerations").

Without suggesting that trial courts are not free, within the bounds of properly exercised discretion, to differ, we proffer that in most cases, serious consideration be given to dismissing an indictment with prejudice after a second hung jury mistrial.[15] Again, this is not to say that the preclusion of even a second trial or the allowance of a third or even more trials would not be appropriate in certain circumstances.

In this case, two full, nearly identical trials on a serious charge were held, following which two separate juries were unable to reach a verdict despite sound judicial efforts to encourage a "considered judgment." There was no indication that a third trial would proceed in a manner any different than did the previous two. Considering this and other evidence in the record, we do not perceive the trial court to have abused its discretion in dismissing the indictment of Moriwake.[16]

---

[15] This guideline comports with prior statutory law and apparent prior practice in this jurisdiction. RLH § 4030 (1925), first enacted in 1876 (L. 1876, c. 40, § 3), provided in relevant part that "the successive disagreement of two juries impaneled to try the cause . . . shall operate as an acquittal of the accused, and the court shall order his discharge from custody." The requirement was deleted in 1932 for the reason that "no such provision or phrase is found in the laws of any of the States of the Union, but . . . the practice is to dismiss after two mistrials unless evidence is obtained of jury tampering, or additional evidence obtained after the second mistrial . . . warrants a belief on the part of the prosecution that a third trial will result in a conviction." H. Stand. Comm. Rep. No. 21, 16th Haw. Terr. Leg., 2d Special Session, *reprinted in House Journal, Second Special Session* 175 (1932).

[16] We note here briefly the question of compliance with Hawaii R. Penal P. 12(e), which provides in relevant part that "[w]here factual issues are involved in determining a motion, the [trial] court shall state its essential findings on the record." It is true in this case that the trial court did briefly state at the hearing on Moriwake's dismissal motion the reasons for its decision, and that such statements were transcribed and are part of the record. It is also true that the record is adequate for us to reach an informed conclusion. But in light of what we believe must be our conscientious review of such records to assure the proper exercise of trial discretion, we think it incumbent upon trial courts to express their factual findings in a more formal manner, *i.e.,* in writing. "Because of the nature of criminal proceedings, and because they are in the interests and for the protection of the public, there is a sound basis in public policy for requiring the judge who assumes the serious responsibility of dismissing a case to set forth his reasons for doing so in order that all may know what invokes the court's discretion and whether its action is justified." Salt Lake City v. Hanson, 425 P.2d 773, 775 (Utah 1967).

## IV.

Constitutional principles of double jeopardy posed no implicit bar to reprosecution of defendant Moriwake. However, the trial court properly exercised its inherent power to dismiss the indictment with prejudice. Accordingly, the judgment is affirmed.

*Lawrence R. White,* Deputy Prosecuting Attorney, for plaintiff-appellant.

*Edmund K. U. Yee (Myles T. Yamamoto* on the brief; *Yamamoto & Yee* of counsel) for defendant-appellee.