Electronically Filed
Supreme Court
SCPW-21-0000483
12-OCT-2021
08:57 AM
Dkt. 45 ORD

SCPW-21-0000483

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

_____

IN THE MATTER OF INDIVIDUALS IN CUSTODY
OF THE STATE OF HAWAI'I

_____

ORIGINAL PROCEEDING

<u>ORDER GRANTING IN PART AND DENYING IN PART
PETITION FOR EXTRAORDINARY WRIT PURSUANT TO HRS §§ 602-4,
602-5(5), AND 602-5(6) AND/OR FOR WRIT OF MANDAMUS</u>
(By: Recktenwald, C.J., Nakayama, McKenna, Wilson, and Eddins, JJ.[1])

The COVID-19 pandemic has created an unprecedented public health emergency of global impact. Throughout the pandemic, the Office of the Public Defender ("OPD") has initiated three original proceedings seeking relief related to certain categories of inmates as well as pandemic-related conditions at Hawai'i's community correctional centers and facilities. This order disposes of the third proceeding filed on August 27, 2021.

_____

[1] Chief Justice Recktenwald and Justices Nakayama, McKenna, and Eddins join in Part One, with Justice McKenna also concurring and dissenting separately, in which Justice Wilson joins as to Sections I and III.A., Justice Wilson concurring and dissenting separately, and Justice Eddins also concurring separately. Chief Justice Recktenwald and Justices Nakayama, McKenna, and Wilson join in Part Two, with Justice Eddins dissenting.

(By: Recktenwald, C.J., Nakayama, McKenna, and Eddins, JJ.,
with McKenna, J., also concurring in part and dissenting
in part separately, in which Wilson, J., joins as to Sections I
and III.A., Wilson, J., concurring and dissenting separately,
and Eddins, J., also concurring separately)

In 2020, on two separate occasions, OPD filed
petitions for an extraordinary writ seeking, among other things,
the expedited release of certain categories of inmates at
Hawaiʻi's community correctional centers and facilities.  When
the first petitions were filed in late March 2020,[2] the potential
catastrophic impact of the pandemic on our State, the community,
our citizens, and our correctional centers and facilities was
not determinable.  There were lockdowns across the nation and
the death toll was rising.  When the second petition was filed
in early August 2020, the Oʻahu Community Correctional Center, in
particular, was experiencing a concerning surge in COVID-19
positive cases.

At the time these petitions were filed, the pandemic's
trajectory remained uncertain and vaccinations were not
available.  Given the virulent transmission of the virus within
close quarters and the likelihood that an outbreak and spread of
the virus in Hawaiʻi's community correctional centers and
facilities had the potential to tax the capacities of the health

---

[2]  The first petition was filed on March 24, 2020 in SCPW-20-0000200.  A
second petition was filed on March 26, 2020 in SCPW-20-0000213.  The two
proceedings were thereafter consolidated.

care systems and the limited resources of the community health providers on each of the islands as the State continued to navigate this unprecedented pandemic, this court provided multiple forms of relief, including, among other things, setting forth procedures and processes for consideration by the courts for the release of inmates and pretrial detainees who met certain criteria, which included an opportunity for objection to the release. With respect to the first petition, this court also appointed a Special Master to work with the parties in a collaborative and expeditious manner to address the issues and facilitate a resolution, while protecting public health and public safety.

Since these petitions were filed, three different vaccines have been made available to the public including every inmate and staff at Hawai'i's community correctional centers and facilities. Inmates have been prioritized for vaccination and are encouraged to get vaccinated.

In addition, a class of inmates filed a federal court lawsuit (Chatman v. et al. v. Otani et al., Civil No. 21-00268-JAO-KJM (D. Haw.)) alleging that the Department of Public Safety ("DPS") mishandled the pandemic and failed to implement its Pandemic Response Plan ("PRP") in violation of their constitutional rights. On September 2, 2021, the parties reached a settlement, which includes the establishment of a

3

five-member panel of experts to provide advice and recommendations to assist DPS in its pandemic response.[3]

On August 27, 2021, shortly before the settlement was executed in Chatman v. Otani, OPD filed another petition for an extraordinary writ pursuant to HRS §§ 602-4, 602-5(5), and 602-5(6) and/or for writ of mandamus. The petition seeks the following relief:

> 1)   Order the Circuit, Family and District courts
>       that when adjudicating motions for release:
>       (a) release shall be presumed unless the court
>       finds that the release of the individual would
>       pose a significant risk to the safety of the
>       individual or the public; (b) design capacity
>       (as opposed to operational capacity) of the
>       correctional facility shall be taken into
>       consideration; (c) the health risk posed by the
>       COVID-19 pandemic should be taken into

---

[3]  As part of the settlement, DPS agreed, among other conditions, to:

- screen and quarantine people newly admitted to a correctional facility as provided in its PRP, and subject to any conditions, modifications and/or exceptions set forth therein;

- immediately isolate those who exhibit COVID-19 symptoms and those who test positive for COVID-19 infection as medically appropriate and in accordance with the PRP, taking into account available space, structural limitations, and staffing and other resources within each facility;

- provide reasonably sufficient cleaning supplies to allow all inmates in its custody in correctional facilities to wipe down phones before they use them;

- provide a minimum of two cloth or other appropriate face masks per person, as provided in the PRP; and

- require staff to wear appropriate face masks where necessary within the correctional facilities as provided for in the PRP.

4

consideration.  Motions for release based on the foregoing are for the following categories of incarcerated persons:

a.      Individuals serving a sentence (not to exceed eighteen months) as a condition of felony deferral or probation, except for: (i) individuals serving a term of imprisonment for a sexual assault conviction or an attempted sexual assault conviction; or (ii) individuals serving a term of imprisonment for any felony offense set forth in HRS Chapter 707, burglary in the first degree (HRS §§ 708-810, 708-811), robbery in the first or second degree (HRS §§ 708-840, 708-841), abuse of family or household members (HRS §§ 709-906(7) and (8), and unauthorized entry in a dwelling in the first degree and in the second degree as a class C felony (HRS §§ 708-812.55, 708-812.6(1) and (2), including attempt to commit those specific offenses (HRS §§ 705-500, 705- 501).

b.      Individuals serving sentences for misdemeanor or petty misdemeanor convictions, except those convicted of abuse of family or household members (HRS § 709-906), violation of a temporary restraining order (HRS § 586-4), violation of an order for protection (HRS § 586-11), or violation of a restraining order or injunction (HRS § 604-10.5).

c.      All pretrial detainees charged with a petty misdemeanor or a misdemeanor offense, except those charged with abuse of family or household members (HRS § 709-906), violation of a temporary restraining order (HRS § 586-4), violation of an order for protection (HRS § 586-11), or violation of a restraining order or injunction (HRS § 604-10.5).

d.      All pretrial detainees charged with a felony, except those charged with a sexual assault or an attempted sexual assault, any felony offense set forth in HRS Chapter 707, burglary in the first degree (HRS §§ 708-810, 708-811), robbery in the first or second degree (HRS §§ 708-840, 708-841), abuse of family or household members (HRS §§ 709-906(7) and (8), and unauthorized entry in a dwelling in the first degree and in the second degree as a class C felony (HRS §§ 708-

5

812.55, 708-812.6(1), including attempt to commit those specific offenses (HRS §§ 705-500, 705-501).

2) Order the Circuit, Family and District courts, DPS, and the HPA to reduce the population of Hawaiʻi's correctional facilities to allow for the social separation and other measures recommended by the CDC to prevent the spread of COVID-19 by taking immediate steps to reduce the population those facilities to their design capacity and/or Infectious Disease Emergency Capacity as recommended by the Hawaiʻi Correctional System Oversight Commission.

3) Appoint a public health expert to enter into all of Hawaiʻi correctional facilities and review protocols, the ability to social distance and make recommendations.

4) Order testing for COVID-19 for all incarcerated persons and staff at Hawaiʻi correctional facilities and to notify all parties of any positive or presumptive-positive test results for any incarcerated person. The information released to the parties should include the individual's name, date of test and date of test result.

5) Order the Circuit, Family and District courts to suspend the custodial portions of such sentence until the conclusion of the COVID-19 pandemic or until deemed satisfied for individuals serving intermittent sentences.

6) Order that the practice of no cash bail, including the release of individuals on their own recognizance, on signature bonds, or on supervised release, should be regularly employed, and pretrial detainees who are not a risk to public safety or a flight risk should not be held simply because they do not have the means to post cash bail.

7) Order the HPA to expeditiously address requests for early parole consideration, including conducting hearings using remote technology. The HPA should also consider release of incarcerated persons who are most vulnerable to the virus, which includes individuals who are 65 years old and older, have underlying health conditions, who are pregnant, and those individuals being held on technical parole violations (i.e. curfew violations, failure to report as directed, etc.) or who have been designated as having "minimum" or "community"

6

security classifications and are near the maximum term of their sentences. The HPA shall prepare and provide periodic progress reports to the parties of their efforts and progress in the aforementioned areas. The reports should include a list of the names of individuals who have been granted release, the names of the individuals who are under consideration for release, and the names of the individuals who were considered for release but for whom release was denied.

8) Order DPS to adhere to the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities in all Hawaiʻi correctional facilities.

9) Order DPS to adhere to its Pandemic Response Plan – COVID-19 (May 28, 2021 rev.)

10) Order DPS to comply with the requirements of HRS § 353-6.2 and conduct periodic reviews to determine whether pretrial detainees should remain in custody or whether new information or a change in circumstances warrants reconsideration of a detainee's pretrial release or supervision.

Answers to the petition were filed by respondents (1) Max N. Otani, DPS Director and Edmund (Fred) K.B. Hyun, Chairperson of the Hawaiʻi Paroling Authority, (2) Steven S. Alm, Prosecuting Attorney, City and County of Honolulu, (3) Andrew H. Martin, Prosecuting Attorney, County of Maui, (4) Kelden B.A. Waltjen, Prosecuting Attorney, County of Hawaiʻi, and (5) Justin F. Kollar, Prosecuting Attorney, County of Kauaʻi.

A hearing was held before this court on September 22, 2021.

Based upon consideration of the petition, the respective answers, and the arguments presented at the September

7

22, 2021 hearing, the record is insufficient to warrant the extraordinary relief requested except as it relates to DPS's compliance with the requirements of HRS § 353-6.2.[4]

Unlike when OPD filed its August 2020 petition, the total number of active positive COVID-19 cases among inmates in all Hawaiʻi community correctional centers and facilities as of October 8, 2021 is 34. Vaccines are now widely available to all inmates, and it has been reported that statewide, as of September 14, 2021, 66% of inmates are fully vaccinated. Additionally, as this court has stated in the prior proceedings, OPD or defense counsel are not precluded from filing individual motions seeking the release of any inmate or pretrial detainee, and the State continues to have the option of filing individual

---

[4] HRS § 353-6.2 provides as follows:

> Community correctional centers; periodic reviews of pretrial detainees.
>
> (a) The relevant community correctional centers, on a periodic basis but no less frequently than every three months, shall conduct reviews of pretrial detainees to reassess whether a detainee should remain in custody or whether new information or a change in circumstances warrants reconsideration of a detainee's pretrial release or supervision.
>
> (b) For each review conducted pursuant to subsection (a), the relevant community correctional center shall transmit its findings and recommendations by correspondence or electronically to the appropriate court, prosecuting attorney, and defense counsel.
>
> (c) If a motion to modify bail is filed pursuant to a recommendation made pursuant to subsection (b), a hearing shall be scheduled at which the court shall consider the motion.

8

motions seeking to modify the release status of any defendant. OPD has not shown that they have been precluded from using this procedural mechanism, or substantiate why this procedure is an inadequate remedy. Moreover, the trial courts have full discretion whether to set bail and to impose conditions of release.[5] Further, the relief that is being requested regarding adherence to public health standards and compliance with the PRP within the correctional centers and facilities are currently being reviewed by the five-member panel established under the settlement agreement in Chatman v. Otani. And, finally, issues regarding inmate populations may be addressed through alternative means, including by the Hawaiʻi Correctional Systems Oversight Commission.

As to OPD's request for relief regarding compliance with HRS § 353-6.2, there is dispute as to whether DPS has conducted the periodic reviews and provided the required information. At the hearing, DPS acknowledged that this action is a "ministerial" duty and indicated that it "intends" and "plans" to conduct the review and transmit the information as statutorily required.

Accordingly,

---

[5] This court notes Hawaiʻi's constitutional protection prohibiting the imposition of "punishment" pending trial as well as the setting of excessive bail. See Haw. Const. art. I, § 12. These constitutional principles should serve as guidance in determining whether to impose bail, particularly in light of the impact of the pandemic.

9

It is ordered that the petition is granted in part and denied in part as follows:

1.   DPS shall comply with the requirements of HRS § 353-6.2, including timely transmitting its findings and recommendations by correspondence or electronically to the appropriate court, prosecuting attorney, and defense counsel.

2.   In all other respects, the petition is denied.

This original proceeding is concluded.

DATED:  Honolulu, Hawaiʻi, October 12, 2021.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama



/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

**PART TWO**
(By: Recktenwald, C.J., Nakayama, McKenna, and Wilson, JJ., with Eddins, J., dissenting)

I.   **This Court Has the Authority to Grant Relief Similar to That Ordered in the Two Prior Original Proceedings.**

Justice Eddins's concurrence questions this court's authority to grant additional relief beyond ordering DPS to comply with HRS § 353-6.2.  Although a majority of the court determined in Part One that OPD has failed to demonstrate entitlement to such additional relief, we nevertheless take this opportunity to address this court's inherent, constitutional and

10

statutory authority to grant extraordinary relief in unique circumstances.  Specifically, we reaffirm this court's authority to provide the relief the court granted with respect to the prior OPD petitions (e.g., the March 2020 and August 2020 petitions).

OPD sought a wide range of relief in the prior proceedings, some of which was granted, and much of which was denied without discussion.  In separate filings, Justice Wilson dissented from the court's denial of those items of relief.  The relief that was granted generally focused on expedited decision making with regard to whether certain lower-risk inmates in custody should be released, consistent with protecting public safety.  The premise of that relief was that ordinary mechanisms for determining individualized requests for release could not work quickly enough to meet the extraordinary circumstances that were presented (1) in the very early days of the COVID-19 pandemic in March-April 2020, and (2) when COVID cases "erupt[ed]" at the Oahu Community Correctional Center ("OCCC") in August 2020.[6]  The court also appointed a Special Master, the Honorable Daniel R. Foley (ret.), to work with interested

---

[6]  Kevin Dayton, COVID-19 Cases Erupt at OCCC – 70 more inmates, 7 ACOs Test Positive, Civil Beat (Aug. 13, 2020).
https://www.civilbeat.org/2020/08/covid-19-cases-erupt-at-occc-70-more-inmates-7-acos-test-positive/.

11

parties during the course of the first proceeding.  The court's

April 2020 order provided:

> The role of the Special Master is to work with the parties in a collaborative and expeditious manner to address the issues raised in the two petitions and to facilitate a resolution while protecting public health and public safety.  The Special Master may include, as part of these efforts and discussions, members of the public health community and other affected agencies.
>
> Safety of the inmates, staff, and the public are imperative.  The parties shall consider viable options to keep inmates and the public safe (e.g., bracelet monitoring, alternative locations to house inmates, inmate categories such as age or medical condition, etc.).
>
> . . .
>
> The Special Master shall convene and conduct meetings with the parties and any community agency that the Special Master deems important, in his discretion, to carrying out his role.

Order of Consolidation and for Appointment of Special

Master, Office of the Public Defender v. Connors, SCPW-20-

0000200 at 3 (April 2, 2020).  Special Master Foley

conducted extensive discussions, elicited position

statements from the parties, and filed five detailed

reports with this court documenting those efforts.[7]  Thanks

to extraordinary work by the trial courts, and the efforts

of the parties to the proceedings, inmate populations at

correctional centers were "significanty reduced."  See

---

[7]  Initial Summary Report and Initial Recommendations of the Special Master (Apr. 9, 2020); Second Summary Report and Recommendations of the Special Master (Apr. 23, 2020); Third Summary Report and Recommendations of the Special Master (Apr. 30, 2020); Fourth Summary Report and Recommendations of the Special Master (May 15, 2020); and Fifth Summary Report and Recommendations of the Special Master (May 28, 2020).

Fifth Summary Report and Recommendations of the Special

Master (May 28, 2020) at page 3.[8]

As set forth below, this court has the authority under

the constitution, the court's inherent powers, and various

statutes, to provide extraordinary relief when circumstances

warrant.  This court has previously stated that such power

should be used sparingly, such as when existing remedies are

inadequate, or would take too long to implement.  We reaffirm

those principles now, as well as the court's determination that

the circumstances that existed in March-April and August 2020,

justified the use of those extraordinary powers.  We reject the

suggestion that the court's authority to provide such relief was

restricted by its rule-making authority.  Finally, we note that

courts in other jurisdictions relied on similar powers to

provide relief in the face of the pandemic.

**II.  This Court Has Both Explicit and Inherent Authority to
      Grant Extraordinary Relief in Extraordinary
      Circumstances.**

Our constitution vests the "judicial power of the

State" in the courts.  Haw. Const. art. VI, section 1.  "Nowhere

in [the constitution] is the exact nature of the 'judicial

---

[8]  The Fifth Summary Report noted, "The parties and stakeholders have acted admirably under difficult circumstances in carrying out this Court's orders.  Differences among them have been great at times, but all have done their best to work in a collaborative fashion as encouraged by this Court, despite their differences."  Fifth Summary Report and Recommendations of the Special Master (May 28, 2020) at 12.

power' defined." State v. Moriwake, 65 Haw. 47, 55, 647 P.2d 705, 711-12 (1982) (citations omitted). But "speaking generally, the 'inherent power of the court is the power to protect itself; the power to administer justice whether any previous form of remedy has been granted or not; the power to promulgate rules for its practice; and the power to provide process where none exists.'" Id. at 55, 647 P.2d 712 (quoting In re Bruen, 172 P.1152, 1153 (Wash. 1918)) (emphasis added). This court has held that the "essentially inherent or implied powers of the court are by their nature impracticable if not impossible of all-inclusive enumeration."[9] Id.

Our legislature has enumerated the inherent powers conferred on our courts by the constitution in several provisions of HRS ch. 602.[10] These include this court's power

---

[9] In Moriwake, the court interpreted the trial court's inherent power to "administer justice" pursuant to HRS § 603-21.9(6) (1976) — a provision nearly identical to HRS § 602-5(a)(6) — to include the power to sua sponte dismiss a manslaughter indictment with prejudice after two mistrials. The court held that in deciding when to exercise this power, courts must consider the interest of the public in the proper administration of justice as well as the fundamental fairness owed to a defendant, "with the added ingredient of the orderly functioning of the court system." Moriwake, 65 Haw. at 56, 647 P.2d at 712 (citation omitted).

[10] See id. at 55 n.13, 647 P.2d at 712 n.13 ("In HRS § 603-21.9 (1976), our legislature has undertaken the enumeration of the inherent powers conferred on our circuit courts by the constitution."); Farmer v. Admin. Dir. of Ct., State of Haw., 94 Hawaiʻi 232, 241, 11 P.3d 457, 466 (2000) ("[T]he inherent power of the supreme court is codified in HRS § 602-5(7) [presently § 602-5(a)(6)], which acknowledge[s] this court's jurisdiction and power '[t]o make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it.'").

14

"[t]o make or issue any order or writ necessary or appropriate in aid of its jurisdiction," HRS § 602-5(a)(5), and "[t]o make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it."  HRS § 602-5(a)(6).  Pursuant to HRS § 602-4, this court also has the power of "general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

In recognizing that the inherent powers vested in our courts are broad and not susceptible to precise enumeration, the court has invoked those powers with restraint, in circumstances where existing remedies were either inadequate or would take too long to implement.  See, e.g., State v. Moniz, 69 Haw. 370, 373, 742 P.2d 373, 376 (1987) ("[A] strong commitment to the prudential rules shaping the exercise of our jurisdiction has resulted in a sparing use of this extraordinary power." (citing State v. Fields, 67 Haw. 268, 276, 686 P.2d 1379, 1386 (1978)).

Similarly, in Gannett Pac. Corp. v. Richardson, the court held that "[o]nly where there is urgent reason . . . for the invocation of this court's supervisory jurisdiction over the lower courts, under both HRS §§ 602-4 and 602-5, will this court

15

consider departing from [the doctrine of res judicata]." 59 Haw. 224, 226-27, 580 P.2d 49, 53 (1978). There, the court noted that "we have deviated from this rule only in rare and exigent circumstances," where "allow[ing] the matter to wend its way through the appellate process would not be in the public interest and would work upon the public irreparable harm." Id. at 227, 580 P.2d at 53 (citing Sapienza v. Hayashi, 57 Haw. 289, 554 P.2d 1131 (1976)).

In Gannett, the court considered a petition for a writ of prohibition by representatives of the news media who sought to prohibit the respondent district judge from closing a preliminary hearing from the public. Id. at 226, 580 P.2d at 52. The court held that exercise of the court's supervisory jurisdiction and discretionary power was appropriate because the case presented a question "of grave import . . . involv[ing] not only the right of the accused to be tried by an impartial jury, but . . . also . . . the right of the public to attend and to be present at judicial proceedings." Id. at 227, 580 P.2d at 53. The court noted:

> [B]ecause of the relative frequency with which preliminary hearings are being conducted in the district courts, thus enhancing the probability of collisions between established and fundamental rights, and because it appears to us only too clear that the district courts are in immediate need of direction from this court on a procedural and substantive matter of public importance, we deem it necessary to entertain the petition for writ of prohibition.

Id. (emphasis added); see also Moniz, 69 Haw. at 374, 742 P.2d at 376 (holding that "a classic example of when this court should exercise its supervisory power" is when the lower courts have differed in their interpretations of a statute).

Similar but even more serious concerns were presented by the March 2020 and August 2020 petitions that were granted in part by this court. The premise of the relief granted was that ordinary mechanisms for determining individualized requests for release could not work quickly enough to meet the extraordinary circumstances that were presented (1) in the very early days of the COVID-19 pandemic in April 2020, and (2) when COVID cases "erupt[ed]" at OCCC in August 2020. In an effort to prevent irreparable harms and provide direction to the trial courts, the court invoked its supervisory jurisdiction and discretionary power.

Such action, though rare, is far from unprecedented. In several cases, this court and the ICA have relied on HRS § 602-5(a)(6) [previously HRS § 602-5(7)] to modify trial court judgments to prevent unfair results. In State v. Arlt, 9 Haw. App. 263, 277, 833 P.2d 902, 910 (1992), the ICA vacated a defendant's conviction as to First Degree Robbery and remanded to the circuit court with instructions to enter a judgment convicting and resentencing the defendant for Theft in the Fourth Degree. The ICA stated that "[s]ince there is no statute

17

or constitutional provision in Hawaii which specifically vests in the appellate courts the express authority to affirm, reverse, remand, vacate, or set aside any judgment, decree, or order of a court brought before them, such authority presumably derives from [HRS § 602-5(a)(6)]." Id. The ICA thus interpreted HRS § 602-5(6) to allow an appellate court to modify a trial court's judgment of conviction if the interests of justice would be thereby promoted. Similarly, in Farmer v. Admin. Dir. of the Court, 94 Hawai'i 232, 241, 11 P.3d 457, 466 (2000), this court relied on its inherent powers under article VI, section 1 of the constitution and the statutory authorization under HRS § 602-5(6) in unanimously holding that "justice require[d]" that the defendant be given an opportunity to challenge the lifetime revocation of his driver's license after one of the three predicate convictions on which his revocation was based was set aside, even though the district court's rules specifically precluded such a remedy.[11]

As noted by the concurrence, this court has not previously provided relief of the type provided in response to

_____

[11] See also Hawaii Pub. Emp. Rels. Bd. v. Hawaii State Tchrs. Ass'n, 55 Haw. 386, 520 P.2d 422 (1974) (reducing the fines imposed for civil contempt from $190,000 to $100,000 because, pursuant to HRS § 602-5(7) [presently HRS § 602-5(a)(6)], "the promotion of justice would be better enhanced."); CARL Corp. v. State, Dep't of Educ., 85 Hawai'i 431, 460, 946 P.2d 1, 30 (1997) (recognizing and awarding attorneys' fees based on court's inherent powers "to create a remedy for a wrong even in the absence of specific statutory remedies, and to prevent unfair results").

18

the March 2020 and August 2020 petitions.[12]   Thankfully, the court has never before been faced with circumstances such as the global COVID pandemic.  The deadly implications of the pandemic — particularly in light of the overcrowding in our state's correctional facilities — were largely unknown in March 2020.  Moreover, the rapid spread of COVID in our prisons and jails in August 2020 presented an immediate threat that the virus would spread from the correctional system into our community, and strain already overtaxed health resources.

These unknown and potentially catastrophic circumstances required a coordinated response from the judiciary.  The work done by Special Master Foley on behalf of this court during the March 2020 petition was invaluable: he facilitated extensive discussion and problem-solving between the parties, and collected essential information for use by the court.  That work was done at remarkable speed: his first report, with detailed submissions from the parties and others with relevant information, was submitted on April 9, 2020, only one week after he was appointed.  This report, and the four that followed, provided the basis for prompt, informed, and

---

[12]   However, this court's cases recognize that courts can use their inherent powers to promote justice even when it implicates authority typically exercised by the executive branch.  For example, Moriwake recognized that courts can dismiss cases with prejudice after two mistrials resulting from a hung jury, even though decisions about whether to initiate prosecutions are generally entrusted to the executive branch. 65 Haw. at 48, 647 P.2d at 707.

coordinated decision-making by this court.  It simply would not have been feasible for individual trial courts to replicate that effort on a case-by-case basis.[13]

These extraordinary circumstances justified the use of the court's supervisory power to ensure that decisions about the release of inmates due to COVID concerns were made in a prompt, coordinated manner that minimized risks to inmates and the public as a whole, and promoted a fair and efficient judicial process.  This court's orders established presumptions, provided discretion to the trial judges where appropriate, and made system-wide determinations when necessary.  The alternative — waiting for trial court decisions relating to the release of specific inmates to be appealed to this court — would have taken too long under the circumstances, with different trial courts taking different approaches in the meantime.  That piecemeal approach would have increased the risk to our community.[14]  As

---

[13]  Special Master Foley's work also provided the background that enabled this court to act promptly when COVID "erupt[ed]" in our prisons and jails in August 2020.  When the OPD filed its petition on August 12, 2020, it was reported that there were  23 positive cases in OCCC (16 inmates and 7 staff), with the number rising to over 200 positive cases in just a few days.  The court held a hearing within 48 hours, and issued its first order addressing the situation that evening.

[14]  In addition to permitting delay, the narrow interpretation of this court's powers advanced by the concurrence would have precluded action even where no reasonable dispute existed about the need for a prompt, uniform response.  For example, information submitted to this court early in the March proceedings indicated that some prisoners were still serving "intermittent" sentences.  See Order of Consolidation and for Appointment of Special Master, Office of the Public Defender v. Connors, SCPW-20-0000200 at 3 (April 2, 2020).  As the court noted then, "[t]hese sentences involve defendants serving a sentence that requires them to repeatedly come in and go

the court has previously recognized, providing relief when delay will result in harm is a legitimate use of our supervisory power.  See, e.g., Gannett, 59 Haw. at 226-27, 580 P.2d at 53 (1978).  And, as set forth below, other state supreme courts and chief justices came to the same conclusion and, likewise, identified categories of lower-risk offenders who could be released, if certain conditions were met, to alleviate overcrowding and reduce the risk of COVID spreading in correctional facilities and then into the community.[15]

Inasmuch as the "inherent power of the court is . . . the power to provide process where none exists," our grants of partial relief in the previous OPD petitions were appropriate under HRS §§ 602-4 and 602-5.  Moriwake, 65 Haw. at 55, 647 P.2d at 712.  The provision of such remedies was consistent with the purpose of our constitution and statutes to ensure a fair and efficient judicial process.

---

out of correctional centers, which appear to directly contravene the intent of the current Department of Public Safety Policy of disallowing visits from those in the community in an effort to prevent the introduction of COVID-19 into correctional centers."  The court directed that the custodial portion of such sentences be suspended until the conclusion of the pandemic, or deemed satisfied at the discretion of the sentencing judge.  Id. at 5-6.

[15]  See Comm. for Pub. Couns. Servs. v. Chief Just. of Trial Ct., 142 N.E.3d 525, 543-44 (Mass. 2020); Kentucky Court of Justice Emergency Release Schedule for Pretrial Defendants and Emergency Pretrial Drug Testing Standards in Response to COVID-19 Emergency, 2020-27 (April 23, 2020), https://www.kacdl.net/Files/COVID19%20updates/week%20of%204.20/order%202020-27.pdf [hereinafter, Kentucky 2020-27 Order].

This analysis is not affected by the fact that this court has rule-making authority under article VI, section 7 of the constitution.  That provision provides that the "[t]he supreme court shall have power to promulgate rules and regulations in all civil and criminal cases for all courts relating to process, practice, procedure and appeals, which shall have the force and effect of law."  The court's orders in the prior proceedings did not purport to be rules or regulations: the court did not invoke its rule-making power in adopting them, and none of the parties ever suggested that the orders should have been subject to the court's rule-making process, or limited by the provisions of HRS § 602-11.[16] Moreover, nothing in the language of article VI, section 7 suggests that it was intended to restrict this court's inherent judicial powers, which, as noted above, are incorporated into the constitution via article VI, section 1 ("the judicial power of the State shall be vested in one supreme court . . ."), and codified in HRS § 602-5(a)(6).

---

[16]  HRS § 602-11 provides, in part:

> The supreme court shall have power to promulgate rules in all civil and criminal cases for all courts relating to process, practices, procedure and appeals, which shall have the force and effect of law.  Such rules shall not abridge, enlarge, or modify the substantive rights of any litigant, nor the jurisdiction of any of the courts, nor affect any statute of limitations.

**III. Other Jurisdictions' Highest Courts Have Also Exercised Their Supervisory Powers to Provide Relief in Circumstances Similar to Those Here.**

The court's actions on the March 2020 and August 2020 petitions are supported by the response of other state supreme courts to the exigent circumstances caused by the pandemic. In Massachusetts, for example, the supreme judicial court ruled that in order to reduce the exposure of the virus in correctional facilities, COVID-19 shall constitute a "changed circumstance" under Massachusetts law.[17] Comm. for Pub. Couns. Servs. v. Chief Just. of Trial Ct., 142 N.E.3d 525, 530, aff'd as modified, 143 N.E.3d 408 (Mass. 2020). To that end, the court concluded that with certain exclusions,[18] defendants who were pending trial are "entitled to a rebuttable presumption of release. The individual shall be ordered released pending trial on his or her own recognizance, without surety, unless an unreasonable danger to the community would result, or the individual presents a very high risk of flight." Id.

---

[17] The Supreme Judicial Court of Massachusetts cited to two statutes. Mass. Gen. Laws. Ch. 276 § 57 outlines the factors to take into consideration for bail, and § 58 sets forth the court's discretion to consider "changed circumstances or other factors not previously known" in issuing or revoking bail. Mass. Gen. Laws. Ch. 276 §§ 57 and 58.

[18] The exclusions were defendants who were being held without bail under Mass. Gen. Laws. § 58(A), or who were charged with an "excluded offense (i.e., a violent or serious offense enumerated in Appendix A to this opinion)."

23

In support of its actions, the Massachusetts court cited to the broad language in Mass. Gen. Laws. 211 § 3, which in relevant part, states that "[t]he supreme judicial court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors therein if no other remedy is expressly provided[.]"  Id. at 538.

According to the Massachusetts Supreme Judicial Court, for "those individuals who are currently serving sentences of incarceration, absent a finding of a constitutional violation, our superintendence power is limited."  Id. at 530.  The court therefore urged the Department of Corrections and the parole board to work with the special master to expedite hearings, and "to determine which individuals nearing completion of their sentences could be released on time served, and to identify other classes of inmates who might be able to be released by agreement of the parties, as well as expediting petitions for compassionate release."  Id.

A significant number of incarcerated individuals were released as a result of the Massachusetts Supreme Judicial Court's decision.  In fact, the number of inmates in various counties dropped, in some cases as high as 27 percent, just one month after the court's ruling.[19]

---

[19]  Scott Souza, Plymouth County Jail Population Down 20 Percent Since Court Order, Patch (May 20, 2020), https://patch.com/massachusetts/hingham/

In a subsequent case, the Massachusetts Supreme Judicial Court also expanded the factors a judge is required to consider when evaluating a defendant's motion to stay a sentence pending an appeal. Commonwealth v. Nash, 159 N.E.3d 91, 99 (Mass. 2020). Prior to the pandemic, there were two factors: (1) the defendant's likelihood of success on appeal; and (2) certain security factors. Id. In Christie v. Commonwealth, 142 N.E.3d 55 (Mass. 2020), a third consideration, known as the COVID-19 factor, was included in the calculus. Id. at 59 ("In these extraordinary times, a judge deciding whether to grant a stay should consider not only the risk to others if the defendant were to be released and reoffend, but also the health risk to the defendant if the defendant were to remain in custody.") (emphasis in original). The court in Nash reinforced the COVID-19 factor and emphasized the objective "to reduce temporarily the prison and jail populations, in a safe and responsible manner, through the judicious use of stays of executions of sentences pending appeal."[20] Nash, 159 N.E.3d at 101-02.

---

plymouth-county-jail-population-down-20-percent-court-order; Jimmy Bentley, Norfolk County Jail Population Down 27 Percent Since Court Order, Patch (May 20, 2020), https://patch.com/massachusetts/foxborough/norfolk-county-jail-population-down-27-percent-court-order; Scott Souza, Bristol County Jail Population Down 11 Percent Since Ruling, Patch (May 20, 2020), https://patch.com/massachusetts/attleboro/bristol-county-jail-population-down-11-percent-ruling.

[20] The Washington Supreme Court took a similar action as Massachusetts. There, the court relied on its broad "authority to administer justice and to

25

Other state supreme courts and chief justices have used their inherent and supervisory authority to grant relief to inmates due to the COVID pandemic. In South Carolina, for example, Chief Justice Donald W. Beatty issued a March 16, 2020, order requiring that "[a]ny person charged with a non-capital crime shall be ordered released pending trial on his own recognizance without surety, unless an unreasonable danger to the community will result or the accused is an extreme flight risk."[21] Chief Justice Beatty also required that in bond hearings, "[i]f a defendant has been in jail as a pre-trial detainee for the maximum possible sentence, the court shall convert the bond to a personal recognizance bond and release the defendant."[22]

In Maryland, Chief Judge Mary Ellen Barbera issued an order on April 14, 2020. Citing to the judiciary's authority under the Maryland Constitution[23] and the emergency powers

_____

ensure the safety of court personnel, litigants, and the public" and issued an order that provided "a uniform, coordinated response from Washington courts to prevent further outbreak and to maintain consistent and equitable access to justice[.]" In the Matter of Statewide Response By Washington State Courts to the COVID-19 Public Health Emergency, Amended Order No. 25700-B-607 (March 20, 2020), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Supreme%20Court%20Emergency%20Order%20re%20CV19%20031820.pdf. The Washington Supreme Court ordered, inter alia, that COVID-19 may constitute a "material change in circumstances" as a factor for judges to consider in motions for pre-trial release. Id.

[21] Memorandum (March 16, 2020), https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=2461.

[22] Id.

[23] Maryland Const. art. IV, section 18.

26

granted by the Maryland Rules of Practice and Procedure,[24] Chief Judge Barbera required judges to consider a variety of factors in determining whether to release adult defendants from pretrial detention, including, inter alia, whether the defendant suffers from pre-existing conditions that render the defendant more vulnerable to COVID-19 or whether the release of the defendant during the pandemic is in the interest of justice.[25] Furthermore, Chief Judge Barbera also ordered that "judges should consider the risk that COVID-19 poses to people confined in correctional facilities when taking into account all statutory requirements and relevant Maryland Rules in determining release conditions and the status of defendants pending sentencing and appeal[.]"[26]

Similar to some of this court's orders, the Kentucky Supreme Court ordered the emergency administrative release of any defendant charged with a non-sexual/non-violent misdemeanor who had not been classified as high risk for new criminal

---

[24] Maryland Rules of Practice and Procedure Rule 16-1001.

[25] Administrative Order Guiding the Response of the Trial Courts of Maryland to the COVID-19 Emergency As It Relates to Those Persons Who Are Incarcerated Or Imprisoned (April 14, 2020), https://mdcourts.gov/sites/default/files/admin-orders/20200414guidingresponseoftrialcourts.pdf.

[26] Id.

activity.[27]  Those charged with a non-sexual/non-violent Class D felony were also eligible for release.[28]  As a result, according to Kentucky's Administrative Office of the Courts, more than 35,000 inmates were released since the start of the pandemic either from a judge's order or on administrative release up through October 3, 2020.[29]  While the Governor of Kentucky also ordered additional releases utilizing his executive power under

---

[27]  Kentucky 2020-27 Order at 2.

In its 2020-27 Order, the Kentucky Supreme Court did not cite its statutory or constitutional authority.  Justice Eddins' concurrence refers to Kentucky's 2020-45 Amended Order in which the Kentucky Supreme Court referenced Section 116 of the Kentucky Constitution and its own Supreme Court Rule 1.010 as authority to issue its order.  In Re: Kentucky Court of Justice Response to COVID-19 Emergency: Amended Release Schedule and Pretrial Drug Testing Standards, 2020-45 (May 29, 2020), https://kycourts.gov/Courts/Supreme-Court/Supreme%20Court%20Orders/202045.pdf.

According to Section 116, "The Supreme Court shall have the power to prescribe rules governing its appellate jurisdiction, rules for appointment of commissioners and other court personnel, and rules of practice and procedure for the Court of Justice.  The Supreme Court shall, by rule, govern admission to the bar and the discipline of members of the bar."  Ky. Const., section 116.

In Rule 1.010, "The policy-making and administrative authority of the Court of Justice is vested in the Supreme Court and the Chief Justice.  All fiscal management, personnel actions and policies, development and distribution of statistical information, and pretrial release services come with that authority."  Ky. R. Sup. Ct. 1.010.

Both authorities cited by the Kentucky Supreme Court align with this court's own constitutional mandates.  See Haw. Const. Art. VI, sections 6 and 7.  Like Kentucky, our court "shall have power to promulgate rules and regulations" and the chief justice "shall be the administrative head of the courts."  Haw. Const. Art. VI, sections 6 and 7.

[28]  Id.

[29]  James Mayse, Data Show Most Inmates Released Haven't Committed New Offense, Messenger-Inquirer (Oct. 3, 2020), https://www.messenger-inquirer.com/news/local/data-show-most-inmates-released-havent-committed-new-offense/article_dce5925b-7ff4-5df1-a40e-975aaffef440.html.

the Kentucky Constitution,[30] each executive order reduced the sentences of specific incarcerated individuals based on the recommendations by the Justice and Public Safety Cabinet.[31]  The Kentucky Supreme Court, however, utilized its supervisory powers to order the lower courts to follow the broad emergency administrative release schedule to "further protect the health and safety of our criminal justice partners--peace officers, county jails, and pretrial drug testing providers--and to protect the health and safety of all pretrial defendants and any defendants housed in county jails[.]"  2020-27 Order at 1.

## IV.  Conclusion

This court has the authority to grant the relief that was ordered in the March 2020 and August 2020 petitions, pursuant to explicit and inherent authority under the constitution and state statutes.  While this court uses that power with restraint, the circumstances that existed when the

---

[30]  According to the Kentucky Constitution, the governor shall have the power to "commute sentences . . . and he shall file with each application therefor a statement of the reasons for his decision thereon, which application and statement shall always be open to public inspection."  Ky. Const., section 77.

[31]  Exec. Order No. 2020-699 (Aug 25, 2020), https://governor.ky.gov/attachments/20200825_Executive-Order_2020-699_Commutations.pdf (reducing the sentences of 646 identified inmates); Exec. Order No. 2020-293 (April 24, 2020), https://governor.ky.gov/attachments/20200424_Executive-Order_2020-293_Conditional-Commutation.pdf (reducing the sentences of 352 identified inmates);  Exec. Order No. 2020-267 (April 2, 2020), https://governor.ky.gov/attachments/20200402_Executive-Order_2020-267_Conditional-Commutation-of-Sentence.pdf (reducing the sentences of 186 identified inmates).

29

March 2020 and August 2020 petitions were adjudicated justified its use.

DATED:  Honolulu, Hawai'i, October 12, 2021.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama



/s/ Sabrina S. McKenna

/s/ Michael D. Wilson